UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

UNITED STATES OF AMERICA,

v.

NELSON DOMINIQUE BRYANT,

Defendant.

No. 25-cr-0097-JDB

---

**MEMORANDUM OPINION AND ORDER**

Historically, when a magistrate judge has ordered a defendant's release, that same magistrate judge has automatically stayed their decision. No longer. Instead, the Court will analyze the four "traditional stay factors" established in *Nken v. Holder*, 556 U.S. 418 (2009). Here, the four factors lead the Court to DENYING the Government's motion to stay.

**I.  BACKGROUND**

  A.  Staying Release Orders

Because "[i]t takes time to decide a case on appeal" and "no court can make time stand still[,]" a court may grant a stay of a judicial decision pending such appellate review. *Nken*, 556 U.S. at 421 (internal quotations omitted) (quoting *Scripps–Howard Radio, Inc. v. FCC*, 316 U.S. 4, 9 (1942)). "The authority to hold an order in abeyance pending review allows an *appellate* court to act responsibly. A reviewing court must bring considered judgment to bear on the matter before it, but that cannot always be done quickly enough to afford relief to the party aggrieved by the order under review." *Id.* at 427 (emphasis added).

1

"At the same time, a reviewing court may not resolve a conflict between considered review and effective relief by reflexively holding a final order in abeyance pending review." *Id.* "A stay pending appeal is an extraordinary remedy. It is 'an intrusion into the ordinary processes of administration and judicial review and accordingly is not a matter of right.'" *M.M.V. v. Barr*, 459 F.Supp.3d 1, 4 (D.D.C. 2020) (internal citations omitted) (quoting *Nken*, 556 U.S. at 427).

This is especially true in the context of government motions to stay release orders given that "[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Munchel*, 991 F.3d 1273, 1279 (D.C. Cir. 2021) (quoting *United States v. Salerno*, 481 U.S. 739, 755 (1987)).

B.  Defendant's Release Order

On June 9, 2024, law enforcement approached a crowd of people in the 1900 block of 9th Street, N.W., after receiving a tip that a person that matched the Defendant's description possess a firearm. As law enforcement approached the Defendant, they saw him hand something to an unidentified man. The unidentified man then dropped a firearm and fled. The unidentified man evaded capture. Meanwhile, law enforcement arrested the Defendant.

On June 10, 2024, the government charged the Defendant with one count of carrying a pistol without a license, in violation of 22 D.C. Code § 4504(a)(1), and one count of possession of a firearm by a person previously convicted of a crime punishable by a term of imprisonment exceeding one year, in violation of 22 D.C. Code § 4503(a)(1). *See* 2024-CF2-005618.

On June 13, 2024, a magistrate judge in D.C. Superior Court denied the government's request for pretrial detention. The judge released the defendant on conditions of release to include GPS monitoring and a stayaway order. On June 14, 2024, the Defendant reported as directed for installation of the GPS monitor. On July 2 and August 5, 2024, the Pretrial Services Agency

submitted reports, notifying the Superior Court judge that the Defendant was in compliance with his conditions of release.

On September 12, 2024, the defendant was arrested on an unrelated complaint filed in Superior Court. *See* 2024 CF1 009151. The magistrate judge detained the Defendant in that case. On April 1, 2025, the government moved to dismiss this case. The government stated no basis for doing so, but rather entered a *nolle prosequi*. At no point did a grand jury make a probable cause finding in that case, and it is unclear why no preliminary hearing was held.

Following the dismissal, the Superior Court judge scheduled a bond review hearing for in the original gun case. But before the motion could be heard, a grand jury in this court returned an indictment charging a violation of 18 U.S.C. § 922(g). The government then moved to dismiss the Superior Court case.

On April 15, 2025, the Defendant appeared before the undersigned for a detention hearing. During that hearing, the Government requested pretrial detention. The Court ordered the Defendant released subject to certain conditions, including: home detention at his third-party custodian's residence in Waldorf, Maryland; supervision by his third-party custodian—a firefighter of several years; remote camera monitoring of the residence when the third-party custodian or his wife are not at home; limitation of visitors to the residence to immediate family of the Defendant and the third-party custodian; daily searches by the third-party custodian of the Defendant; and GPS monitoring of the defendant. *See* Conditions of Release. The Government sought to appeal that release decision and moved for a stay of release pending appeal.

The Court refused to *automatically* stay the release decision. The Court found that the Government could not meet its burden under *Nken*. This Order memorializes the reasoning for that decision.

## II. LEGAL STANDARD

The "traditional" standard for a stay requires courts to consider four factors: "whether (1) [the party seeking the stay] is likely to prevail on the merits on appeal; (2) [the party seeking the stay] will be irreparably harmed in the absence of a stay; (3) other parties will not be substantially harmed by the entry of a stay; and (4) the public interest favors a stay." *United States v. Khanna*, 703 F. Supp. 3d 1309, 1313 (N.D. Okla. 2023) (paraphrasing the "*Nken* factors"); *see also United States v. Taylor*, No. 21-cr-392, 2021 WL 2439231, at *1 n.1 (D.D.C. June 15, 2021).

"[A] stay is an exercise of judicial discretion, and whether to grant it depends upon the specific circumstances of the case. The moving party bears the burden of justifying why the court should grant this extraordinary remedy." *M.M.V.*, 459 F. Supp. 3d at 4 (internal citations omitted).

## III. DISCUSSION

What typically happens when the Government appeals a release order is that the magistrate judge automatically stays their decision for several days, giving the government time to file their appeal with the assigned district judge. This has allowed the United States to artificially manufacture an automatic stay when the law naturally created none. But do courts even have the authority to stay release decisions?

### A. The Bail Reform Act Does Not Authorize a Stay Pending Appeal

We first look to the statute for answers: here, the Bail Reform Act. Nothing in the Bail Reform Act authorizes—let alone requires—a stay. That is not to say that the Bail Reform does not contemplate appeals at all. It states that motions to review a release order and appeals of such motions "shall be determined promptly." 18 U.S.C. § 3145(a), (c). If "Congress intends to make a procedural mechanism automatic, it does so explicitly. For example, certain statutes have clear language mandating automatic stays." *United States v. McLean*, 749 F. Supp. 3d 167, 171 n.2

(D.D.C. 2024) (citing *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin*, 599 U.S. 382 (2023) ('[T]he [Bankruptcy] Code includes a number of requirements, like the automatic stay provision [at 11 U.S.C. § 362(a)], that generally apply to all creditors.') and *Nken,* 556 U.S. at 418 (discussing the Immigration and Nationality Act's automatic stay provision, which was later repealed))." And the courts are not here to clean up Congress' drafting mistakes. *See Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 164–65 (2008) (declining to expand a cause of action beyond the contours of what Congress expressly provided because "the jurisdiction of the federal courts is carefully guarded against expansion by judicial interpretation"). Thus, there is no statutory basis for a stay of a release order.[1]

      B.    <u>Common Law Does Not Authorize an Automatic Stay Pending Appeal</u>

We next look to the case law for answers. In this circuit, judges use the *Nken* factors to determine whether a decision should be stayed in a variety of case types: immigration, *see, e.g.*, *M.M.V.*, 459 F. Supp. 3d at 1; presidential removal power, *see Dellinger v. Bessent*, No. 25-cv-5052, 2025 WL 887518, at *1 (D.C. Cir. Mar. 10, 2025); First Amendment, *cf. Grace v. Whitaker*, No. 18-cv-1853, 2019 WL 329572, at *1 (D.D.C. Jan. 25, 2019) (applying *Nken* factors to injunctive relief); and more. Courts have also applied the *Nken* factors in criminal cases, including when the *defendant* moves to stay. *See, e.g.*, *United States v. Trump*, 704 F. Supp. 3d 1 (D.D.C. 2023).

---

[1] At least two federal district courts previously had local rules that required automatic stays of a release decision. *See United States v. Craven*, No. 08-cr-123, 2008 WL 2945001, at *2 n.2 (N.D. Okla. July 25, 2008) (mentioning Northern District of Oklahoma's local "automatic stay" rule in passing); *see also United States v. Torres*, 86 F.3d 1029, 1030 n.1 (11th Cir. 1996) (mentioning Southern District of Florida's local "automatic stay" rule in passing). However, those district courts have since amended their local rules to eliminate such stays.

Yet, there is a dearth of case law from judges applying these factors to resolve the government's motion to stay a release order. The little caselaw on this question warrants against such stays. *See Taylor*, 2021 WL 2439231, at *1 (Judge Lamberth denied government's motion to stay magistrate judge's release order); Minute Order, *United States v. Young*, No. 1:19-cr-366 (D.D.C. Jan. 27, 2020) (Judge Chutkan refused automatic stay and denied appeal of magistrate judge's release order). Regardless, *Nken* authorizes judges to stay release orders pending appeal. But such stays are not automatic. Instead, they require the four-factor analysis. *See Nken v. Holder*, 556 U.S. 418 (2009).

    C.    <u>Traditional Four-Factor Test of Motions to Stay</u>

Notably, "[t]he first two factors of the traditional standard are the most critical." *Id.* at 434.

    1.    *Likelihood Government Will Prevail on the Merits*

"With respect to the first factor, the Court of Appeals has stated that '[i]t is not enough that the chance of success on the merits [is] better than negligible.' Instead, it must be 'substantial[.]'" *M.M.V.*, 459 F. Supp. 3d at 4 (internal citations omitted) (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009) and *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977)). "The Court has also observed that a movant's failure to satisfy this stringent standard for demonstrating a likelihood of success on the merits is 'an arguably fatal flaw for a stay application.'" *Id.* (quoting *Citizens for Responsibility & Ethics in Washington v. Fed. Election Comm'n*, 904 F.3d 1014, 1019 (D.C. Cir. 2018) (per curiam)).

Here, the government moves to stay the Court's release order. So the government must demonstrate a likelihood that they will prevail on the merits of their argument to detain the Defendant pretrial. Under the Bail Reform Act, an individual must be released pending trial unless the court "finds that no condition or combination of conditions will reasonably assure the

6

appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1); *see Salerno*, 481 U.S. at 755. "In common parlance, the relevant inquiry is whether the defendant is a 'flight risk' or a 'danger to the community.'" *United States v. Vasquez-Benitez*, 919 F.3d 546, 550 (D.C. Cir. 2019).

To determine whether the Government has met this burden, the Court considers four factors: "(1) the nature and circumstances of the offense charged, (2) the weight of the evidence against the person, (3) the history and characteristics of the person, and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release." *Munchel*, 991 F.3d at 1279 (internal quotation marks omitted) (quoting 18 U.S.C. § 3142(g)(1)–(4)).

Regarding the first factor, the Defendant is charged with a single count of felon in possession. *See* Indictment. It appears that the Defendant was allegedly in *constructive* possession of a firearm. Regardless, courts have repeatedly held that the actual possession of a firearm is not a crime of violence. Because this case involves mere possession and the firearm was not found on the Defendant, this factor weighs in favor of release.

The second factor also weighs in favor of release. No officers ever observed the Defendant with a firearm, nor with a bulge indicating possession of such a firearm. Rather, they apparently observed the Defendant hand something to a person that dropped a firearm and fled. The strength of the evidence against the person that fled is strong, but that person is not the Defendant. And there is no conspiracy allegation, let alone guilt by association.

Regarding the third factor—the defendant's history and characteristics—the Defendant has strong ties to the community, remarkable family support, and been successful on his most recent period of pre-trial supervision. He is a lifelong resident of the area. Prior to the arrest on the now-

dismissed charge, he was residing with his brother, the textbook candidate for a third-party custodian. His brother is a trusted member of law enforcement, a firefighter of several years. He owns a home with his wife and three children. There was no doubt in the Court's mind that this custodian will faithfully ensure the conditions of release are enforced. The custodian is a stabilizing force in the Defendant's life.

The government points to his criminal history as the primary reason for this factor to weigh in favor of detention. Specifically, they argue that his prior convictions as well as the non-prosecuted case indicate his serious criminal history. The Court gives little weight to cases that were not formally charged, let alone tried to a verdict. It is impossible to know the reason that the government failed to charge that case. To find otherwise flies in the face of not only the presumption of innocence and due process, but basic fairness. As to his prior cases, the Defendant's most serious conviction was many years ago. Moreover, the Defendant demonstrated compliance during his recent time on pretrial supervision for the related charge in Superior Court. Pretrial Services noted his compliance. Taking all of this into account, the Defendant's strong community and family ties outweigh his older, criminal history. Thus, the Court concludes that the third factor weighs strongly in favor of release.

Regarding the fourth factor—danger to individual or community—the Government has failed to "identify an articulable threat posed by the defendant to an individual or the community." *Munchel*, 991 F.3d at 1283. They argue merely that he presents a danger of introducing firearms into the community. But even in cases where a defendant planned criminal activity in advance, brought multiple lethal weapons and tasers to harm public officials, encouraged others to try to overthrow the government, and more, courts have found no articulable threat. *See Taylor*, 2021 WL 2439231, at *1 (discussing *Munchel* January 6 defendants). "If these [*Munchel* and *Taylor*]

8

facts are insufficient to support a finding that the defendants posed an articulable threat to the community . . . then the facts here [which are far less dangerous] are likely insufficient as well." *Id.* at *2 (internal citations and quotation marks omitted). Moreover, the Government "has proffered nothing that indicates that [the Defendant] will continue to engage in criminal activity." *Khanna*, 703 F. Supp. at 1314. And, the Court has ordered a combination of conditions that *reasonably* assure—it bears repeating Congress set sets this standard low, not high—the safety of the community. *See supra*. In fact, the Court has increased the severity of the prior restrictions by now placing the Defendant on home detention. With no articulable threat nor evidence of a likelihood to continue engaging in criminal activity, the fourth factor weighs strongly in favor of release. Two facts bear special note: First, that the undersigned is the second judge to determine that the instant offense does not warrant detention. That two judges have independently come to the same conclusion indicates a low likelihood of success when the government takes its third bite at the apple. Second, the undersigned cannot recall the last time when all four factors weighed in favor of release. That again reflects a low likelihood of success.

Based on the forgoing reasons, the Government has failed to meet its burden to prove that the Defendant is a danger to the community. And the Government "failed to indicate any additional information that the Court did not factor into its decision or any information that it could obtain to add detail to its argument." *United States v. Pavon-Andino*, No. 25-mj-022, 2025 WL 446143, at *4 (D. Colo. Feb. 10, 2025). "Therefore, the government is unlikely to succeed on the merits of its motion to revoke release order, and the first [*Nken*] factor weighs against . . . imposition of the stay." *Khanna*, 703 F. Supp. at 1313.

    2.    *Irreparable Harm to Government*

"The second [*Nken*] factor requires more than the mere possibility of irreparable injury. Irreparable harm must be both certain and great." *M.M.V. v. Barr*, 459 F.Supp.3d 1, 4 (D.D.C. 2020) (internal citations and quotation marks omitted). Importantly, "[w]here there is a low likelihood of success on merits, a movant must show a proportionally greater irreparable injury. *M.M.V.*, 459 F.Supp.3d at 4. Thus, "given the low likelihood of success on the merits, the question is whether this showing alone warrants a stay pending appeal." *Id.* at 5. Here, it does not. Because the Government "is unlikely to prevail on the merits on appeal, it will not be irreparably harmed if the stay is revoked." Order 7, *United States v. Sabb*, No. 4:24-cr-045 (N.D. Okla. Aug. 7, 2024), ECF No. 185. Further, any harm to the government is not irreparable, as the Defendant could be re-detained if the District Judge reverses the appeal decision. Indeed, that is the very thing that has already happened to him in Superior Court (i.e., detention on the now-dismissed warrant after he was released in the initial case).

    3.    *Harm to Defendant*

"Unlike the [G]overnment, [the Defendant] will suffer substantial harm through . . . the stay of release order." *Khanna*, 703 F. Supp. at 1316. Pending the appeal, the Defendant will be detained pretrial, likely several days before any appeal may be heard.[2] The loss of liberty is a harm that is substantial. "As recognized by other courts, loss of liberty for the time of pretrial detention

---

[2] "Between 1983—the year before Congress enacted the Bail Reform Act—and 2019, federal pretrial incarceration rates skyrocketed from less than 24% to 75%. *See* Alison Siegler et al., *Freedom Denied: How the Culture of Detention Created a Federal Jailing Crisis*, Univ. Chi. L. Sch. Fed. Crim. Just. Clinic 1, 20–22 (Oct. 2022), https://freedomdenied.law.uchicago.edu/report [hereinafter *Freedom Denied*]. In the same timeframe, the average length of pretrial detention increased from less than two months to almost a year. *See id.* at 23." *United States v. McLean*, 749 F.Supp.3d 167, 169 (D.D.C. 2024).

is irretrievable regardless of the outcome at trial." *United States v. Khanna*, 703 F. Supp. 1309, 1316 (N.D. Okla. 2023) (quoting *Page v. King*, 932 F.3d 898, 904 (9th Cir. 2019)).

But the harm goes beyond loss of liberty. During the pendency of a stay, a defendant in pretrial detention is likely to:

- lose their job[3];
- have limited to no contact with family[4];
- have limited to no contact with their lawyer[5];

---

[3] In one study, 7.1% of people held in pretrial detention for one to three days lost their jobs. *See* Sandra Susan Smith, *How Pretrial Incarceration Diminishes Individual's Employment Prospects*, Fed. Prob., Dec. 2022, at 11, 13. This number ballooned to 30.0% for those who spent four to seven days in pretrial detention. *See id.*

[4] Someone detained pretrial has no "right to be free from punishment." *Bell v. Wolfish*, 441 U.S. 520, 534 (1979). They, therefore will be "involuntarily confined and deprived of the freedom 'to be with [their] family . . . .'" *Id.* at 569 (Marshall, J., dissenting) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972). The costs of compliance with visitation protocols in some pretrial facilities have been described as "so high as to lead detainees to forgo visits with friends and family altogether." *Id.* at 593 (Stevens, J., dissenting). And the effects of limited contact do not only affect those detained: one study noted that their children "may share many of the same risk factors" as children of a convicted parent, including "psychological strain, antisocial behavior, suspension or expulsion from school, economic hardship, and criminal activity." Eric Martin, *Hidden Consequences: The Impact of Incarceration on Dependent Children*, Nat'l Inst. Just., March 1, 2017, at 1, 1–2.

[5] A Department of Justice review exploring concerns detainees and their counsel face in relevant pretrial facilities found that some attorneys reported "routinely wait[ing] more than an hour to meet with clients in a private room" for counsel. Advisory Grp. of DOJ Components, DOJ, *Report and Recommendations Concerning Access to Counsel at the Federal Bureau of Prisons' Pretrial Facilities* 1, 19 (2023) (comprehensive "review of current practices and policies related to access to counsel in Bureau of Prisons . . . pretrial facilities"). Because, "[g]enerally, pretrial facilities had limited equipment" and staffing to support virtual meetings between counsel and their clients, interviewed attorneys were presented with "a difficult choice" of whether to speak with a client in public spaces when no suitable private space was available. *Id.* at 20, 23.

11

- have easy access to illegal narcotics[6]; and

- witness or experience traumatic violence.[7]

The harm of pretrial detention was so grave that one federal judge, "citing complaints of dreadful conditions, near perpetual lockdowns and grave staffing shortages in a long-troubled federal jail in Brooklyn, refused [] to order a man convicted in a drug case to be sent there while awaiting sentencing." *See* Benjamin Weiser, *Judge Refuses to Send Defendant in Drug Case to Troubled Brooklyn Jail*, New York Times (Jan. 4, 2024), https://www.nytimes.com/2024/01/04/nyregion/brooklyn-judge-mdc-jail.html. All of this plays out against an unrebuttable "presumption of innocence." 18 U.S.C. § 3142(j).[8]

---

[6] In 2024, the Department of Justice's Office of the Inspector General published a study researching, among other things, the increasing prevalence of illegal narcotics in federal facilities. *See* Evaluation and Inspections Div., DOJ, *Evaluation of Issues Surrounding Inmate Deaths in Federal Bureau of Prisons Institutions* 55–57 (2024). At the same time, county jails—which often house pretrial detainees on local or state charges—saw a 200% increase in overdose deaths from 2001 to 2018. *See* Beth Schwartzapfel & Jimmy Jenkins, *Overdose Deaths in State Prisons have Jumped Dramatically Since 2001*, NPR (July 15, 2021, 6:00 AM), https://www.npr.org/2021/07/15/1015447281/overdose-deaths-state-prisons-increase [https://perma.cc/QEK3-S5W3]. In these settings, "drug use is not only widespread . . . but also uniquely dangerous" due to frequently ineffective treatment mechanisms. *Id.*

[7] Between 2008 and 2019, at least 4,998 people died while detained pretrial. Peter Eisler et al., *Why 4,998 Died in U.S. Jails Without Getting Their Day in Court*, Reuters (Oct. 16, 2020, 11:00 AM), https://www.reuters.com/investigates/special-report/usa-jails-deaths/ [https://perma.cc/XMK7-XS3P]. Additionally, "a growing body of literature describes [relevant pretrial facilities] as especially chaotic and disorderly and as settings where critical needs and challenges may consistently go unaddressed." Elisa L. Toman et al., *Jailhouse Blues?: The Adverse Effects of Pretrial Detention for Prison Social Order*, 45 Crim. Just. & Behav. 316, 320 (2018). Exposure to the specific and general harms that pretrial detainees experience can result in long-lasting trauma. *See id.* at 320–21.

[8] The Bail Reform Act clearly outlines that detention decisions shall not "be construed as modifying or limiting the presumption of innocence." 18 U.S.C. § 3142(j).

12

Such consequences highlight why "it is fundamental that an individual has a 'strong interest in liberty.'" *Khanna*, 703 F. Supp. at 1316 (quoting *Salerno*, 481 U.S. at 750). Thus, the third *Nken* factor weighs strongly against staying the release order.

    4.    *Public Interest*

Finally, the public interest weighs against staying the release order. As discussed in the first *Nken* factor, the Defendant does not pose an articulable threat to the public's safety. *See supra* Part III.B.1. Moreover, "pretrial detention comes at a cost. Taxpayers spend over $1 billion annually to jail defendants before trial." *McLean*, 749 F. Supp. 3d at 169 n.1 (citing *Freedom Denied*). The Defendant's detention adds to this public cost. Further, "[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *Munchel*, 991 F.3d at 1279 (quoting *Salerno*, 481 U.S. at 755). "Given the improbability that the government will satisfy its burden to show that [the Defendant] falls within a "carefully limited exception," the public interest weighs in favor of revocation of the stay." *Khanna*, 703 F. Supp. at 1316.

Thus, all *Nken* factors weigh against a stay and the Court denies the government's request. To be clear, the government may appeal this order along with the release order to the assigned district judge. "However . . . the mere request for a stay does not require the issuance of one." *Pavon-Andino*, 2025 WL 446143, at *4.

## IV.     CONCLUSION

At bottom, this court cannot square the government's view that stays should be automatic against the sacred principle that a defendant is presumed innocent. Courts must take actions for this principle to have meaning. This is not to say that stays will be automatically rejected. Rather, judges must do what they do in every other civil case—where the stakes are so much lower than in a criminal case—and apply the *Nken* factors to determine if a stay is appropriate.

Date: April 15, 2025

_____
ZIA M. FARUQUI
UNITED STATES MAGISTRATE JUDGE