UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>NELSON BRYANT<br><br>Defendant. | Crim. No. 25-097 (JDB) |

**MEMORANDUM OPINION AND ORDER**

Last spring, a grand jury indicted Nelson Bryant on one count of unlawful possession of a firearm and ammunition by a person convicted of a felony, in violation of 18 U.S.C. § 922(g)(1). Indictment [ECF No. 1] at 1. Bryant now moves to suppress all tangible evidence—including the firearm—recovered during his apprehension and arrest. Def.'s Mot. [ECF No. 30]. He asserts that the Court must exclude the firearm because it was the product of an unlawful seizure of his person. Id. at 3–4.

This Court held an evidentiary hearing on Bryant's motion on November 18, 2025. At that hearing, one of the Metropolitan Police officers at the scene, Officer Lantion, testified. The prosecution also entered into evidence body-worn camera footage from Officer Lantion and his partner, Officer Rodriguez. See Gov't Ex. List [ECF No. 31]; Gov't Exs. 1 ("Rodriguez BWC"), 2 ("Lantion BWC"). Counsel for the defense and the government then argued the motion.

After careful consideration of the evidence and arguments, this Court finds as follows. Metropolitan Police seized Bryant by physical force without reasonable suspicion that he was engaged in criminal activity. This seizure violated Bryant's Fourth Amendment rights. The seizure also caused police officers to discover a firearm. And because the government has not

1

shown that an exception to the exclusionary rule applies, the Court **GRANTS** Bryant's motion to suppress the firearm.

## BACKGROUND

In the early hours of June 9, 2024, a bouncer flagged down two Metropolitan Police Department officers patrolling 9th Street NW, just south of U Street. Nov. 18, 2025, Hr'g. Tr. ("Nov. 18 Tr."), 8:12–14, 11:12–24. The bouncer reported that there was a man with a gun in the area. Id. at 11:20–24. He described the man as a black male, wearing a black hooded sweater, and red and white sneakers. Id. On that same block, Officer Rodriguez spotted an individual matching this description amidst a crowd—Nelson Bryant. Id. at 12:19–25.

Body-worn camera footage captured most of the subsequent events. Officers Rodriguez and Lantion approached Bryant while he was clustered in a group with at least two other men. Rodriguez BWC 01:38:27-49. Bryant had his back to the officers as they approached him. Id. Officer Rodriguez placed a hand on Bryant's upper arm and Bryant turned slightly to face him, at which point Officer Rodriguez asked Bryant "Can I talk to you for a second?" and withdrew his hand from Bryant's arm. Id. at 01:38:51-52; Lantion BWC 01:38:50-52.

At the same time, Officer Lantion came up very close behind Bryant and extended his arms around Bryant's sides, near Bryant's waist. Rodriguez BWC 01:38:51-54; Lantion BWC 01:38:50-54; see also Nov. 18 Tr., 58:2–6. The body-worn camera footage does not reveal whether Officer Lantion's hands touched Bryant. Officer Lantion first testified at the evidentiary hearing that he did not touch Bryant. Nov. 18 Tr., 16:19–21. But on cross-examination, he testified that his left hand was "up," and he was "not sure if it was on [Bryant's] back or his arm." Id. at 60:9–12. And on redirect, Officer Lantion clarified that he did not recall touching Bryant's back but did not disclaim touching his left arm. Id. at 83:7–14.

Regardless, with his left hand either touching or very close to Bryant's left side, Officer Lantion motioned towards the sidewalk with his right hand. Rodriguez BWC 01:38:53. At the evidentiary hearing, Officer Lantion testified that he made this gesture because he wanted to talk to Bryant away from the crowd. Nov. 18 Tr., 58:7–20. But Bryant turned away, apparently uninterested in speaking with the officers. Rodriguez BWC 01:38:52-54. And with his back still turned towards the officers, Bryant approached an unidentified man in a white t-shirt. Lantion BWC 01:38:54-59. A look of surprise came over the unidentified man's face as Bryant came close to him. Lantion BWC 01:38:59. Two seconds later, the unidentified man fled. Id. at 01:39:01. Officers Rodriguez and Lantion pursued him. Id. at 01:39:04-12. And although the unidentified man got away, Officer Rodriguez recovered a handgun close to the man's flight path and approximately 100 feet from where Bryant remained standing. Rodriguez BWC 01:39:12-14.

Officer Lantion testified at the evidentiary hearing that Officer Rodriguez told him that he had seen Bryant pass a firearm to the unidentified man immediately before that man's flight.[1] Nov. 18 Tr., 61:1–3. Officer Lantion was more circumspect, however, when asked what he personally saw. He averred that while he saw Bryant's arms move, as if to transfer an object, he had not seen a gun. Id. at 64:11–22 ("I saw – actually saw with my own eyes when the Defendant lifted his arms up to pass the weapon. Did I actually see the weapon? No."); see also id. at 78:4–25. As the government acknowledged at the evidentiary hearing, a gun is not visible on either of the officers' body-worn camera footage. See id. at 36:13–19.

---

[1] Officer Lantion equivocated on this point, also testifying at the evidentiary hearing that he could not recall what Officer Rodriguez told him about the object transfer. Nov. 18 Tr., 66:8–13. He was also unsure about how and when the unidentified man discarded the firearm. Officer Lantion first testified that he had personally seen the unidentified man toss the gun onto the ground, Nov. 18 Tr., 24:8–13, but he later testified that he had not seen the man toss the firearm. Id. at 67:8–11.

3

After recovering the firearm, Officer Rodriguez returned to where Bryant was standing. Rodriguez BWC 01:39:15-17. When Bryant attempted to walk away, Officer Rodriguez arrested him. Id. at 01:39:18-44.

## ANALYSIS

The Fourth Amendment safeguards the "right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. Unjustified seizures, such as warrantless arrests without probable cause or investigatory stops without reasonable suspicion, may violate the Fourth Amendment. Atwater v. Lago Vista, 532 U.S. 318, 354 (2001); Terry v. Ohio, 392 U.S. 1, 19–20, 30 (1968); see also Robinson v. District of Columbia, 130 F. Supp. 3d 180, 192 (D.D.C. 2015) ("A seizure may be unreasonable . . . because it was unjustified by the circumstances . . . ."). The exclusionary rule serves as the "principal judicial remedy" to deter such violations. Utah v. Strieff, 579 U.S. 232, 237 (2016). The rule generally bars prosecutors from using "the primary evidence obtained as a direct result of an illegal search or seizure and evidence later discovered and found to be derivative of an illegality." Id. (citation modified); see also United States v. Green, 149 F.4th 733, 743 (D.C. Cir. 2025).

To invoke the exclusionary rule, the defendant bears the initial burden to make out a prima facie case that (1) officers conducted a warrantless search or seizure, (2) in violation of the defendant's own Fourth Amendment rights, and (3) there is a causal nexus between the Fourth Amendment violation the defendant alleges and the evidence he seeks to suppress. See United States v. Holmes, 505 F.3d 1288, 1292 (D.C. Cir. 2007); United States v. Sheffield, 832 F.3d 296, 305 (D.C. Cir. 2016). Once a defendant does so, the burden shifts to the government to demonstrate that the search or seizure was reasonable. See United States v. Jones, 1 F.4th 50, 52 (D.C. Cir. 2021) ("It is the government's burden to show that officers had evidence to support a

4

reasonable and articulable suspicion at the time of a [Terry] stop."); see also United States v. Delaney, 955 F.3d 1077, 1081 (D.C. Cir. 2020) (same). If the government cannot justify the search or seizure, it may nevertheless defeat a motion to suppress by showing that the circumstances bar application of the exclusionary rule. For instance, attenuation in the causal chain between the Fourth Amendment violation and the discovery of the evidence may preclude suppression. United States v. Brodie, 742 F.3d 1058, 1063 (D.C. Cir. 2014).

To resolve Bryant's motion to suppress, this Court's analysis proceeds as follows. First, the Court determines whether Bryant has standing to bring the motion. Then, the Court considers whether Bryant was seized and whether that seizure was reasonable. Finally, the Court evaluates whether the discovery of the firearm has a sufficient causal connection to Bryant's seizure to justify application of the exclusionary rule.

**I.     BRYANT HAS STANDING TO CHALLENGE THE SEIZURE OF HIS PERSON**

The Court first confirms that the unlawful seizure Bryant alleges implicates his own Fourth Amendment interests. Or in common parlance, that Bryant has "standing" to seek suppression of the firearm.

Fourth Amendment standing, unlike standing doctrine derived from Article III's case-or-controversy requirement, is a merits inquiry. Sheffield, 832 F.3d at 303; Byrd v. United States, 584 U.S. 395, 410–411 (2018). Because "Fourth Amendment rights are personal rights which may not be vicariously asserted," Plumhoff v. Rickard, 572 U.S. 765, 778 (2014), a defendant only has standing to invoke the exclusionary rule when "the disputed search and seizure has infringed an interest of the defendant which the Fourth Amendment was designed to protect," Rakas v. Illinois, 439 U.S. 128, 140 (1978).

The Government asserts that Bryant lacks standing to seek suppression of the firearm because the firearm was abandoned before Officer Rodriguez recovered it.  While it is true that defendants do not possess Fourth Amendment privacy interests in property they have abandoned, United States v. Thomas, 864 F.2d 843, 845 (D.C. Cir. 1989) (citing Abel v. United States, 362 U.S. 217, 241 (1960)), the government's contention misapprehends the basis for Bryant's motion.

To assess Fourth Amendment standing, "it is critical that the precise police conduct being objected to be properly identified."  Wayne R. LaFave, 6 Search and Seizure: A Treatise on the Fourth Amendment § 11.3 (6th ed., Nov. 2025 update).  Here, Bryant alleges that the firearm was a product of an unlawful seizure of his person.  He does not allege that the officers' search of the street or seizure of the firearm were, in themselves, violations of his Fourth Amendment rights.  So to have Fourth Amendment standing, Bryant need only have a Fourth Amendment interest in the security of his person.  Cf. California v. Hodari D., 499 U.S. 621, 623–24 (1991) (implying that if Hodari D. had been seized, he would have Fourth Amendment standing to seek suppression of the contraband he discarded).  Bryant undoubtedly does.  See Manuel v. City of Joliet, 580 U.S. 357, 364 (2017) (remarking that unlawful detention claims fit the Fourth Amendment like a "hand in [a] glove").  There is no Fourth Amendment standing problem here.

## II.   OFFICER RODRIGUEZ SEIZED BRYANT BY PHYSICAL FORCE

Satisfied that Bryant has Fourth Amendment standing, this Court next considers whether Officer Rodriguez seized Bryant prior to the discovery of the firearm.

An officer seizes a person under the Fourth Amendment when he, "by means of physical force or show of authority, has in some way restrained" that person's liberty.  United States v. Gross, 784 F.3d 784, 786–87 (D.C. Cir. 2015) (quoting Terry, 392 U.S. at 19 n.16).  In Torres v. Madrid, the Supreme Court elaborated that the application of any amount of physical force that

6

"objectively manifests an intent to restrain" is a seizure within the meaning of the Fourth Amendment.  592 U.S. 306, 317 (2021); see also Hodari D., 499 U.S. at 625.  So while an officer need not succeed in subduing a person to seize them through physical force, the circumstances and nature of the force are relevant.  See Torres, 592 U.S. at 312.  "Accidental force will not qualify."  Id. at 317.  And "[a] tap on the shoulder to get one's attention" will generally not effect a seizure because it will "rarely exhibit" intent to restrain.  Id.

Bryant asserts that Officer Rodriguez seized him by means of physical force when he placed his hand on Bryant's upper arm.[2]  The government does not dispute that Officer Rodriguez intentionally touched Bryant but insists that the physical contact was indistinguishable from a tap on the shoulder and was insufficient for a seizure.

Looking closely at both the circumstances surrounding Officer Rodriguez's physical contact with Bryant and the contact itself, this Court concludes that the contact manifested an intent to restrain.  Three key facts, taken together, drive the Court's determination.  First, Officer Lantion approached Bryant from behind and extended his hands to either side of Bryant just as Officer Rodriguez placed his hand on Bryant's upper arm.  Regardless of whether Officer Lantion actually touched Bryant, he blocked Bryant from turning towards the street and walking away.  And a reasonable person, feeling one police officer very close behind him, arms spread to block his egress, would likely conclude that the hand a second police officer simultaneously placed on his arm sought to restrain him.  Cf. United States v. Larremore, 150 F.4th 463, 472 (5th Cir. 2025) (emphasizing that the officer "did not physically block [the defendant] or his truck" when finding that the officer's contact with the truck did not seize the defendant by physical force).

---

[2] Bryant does not claim that he was seized through a show of authority.  Nov. 18 Tr., 92:5–16.

7

Second, once Bryant turned to face the officers, Officer Lantion motioned away from the crowd and towards the sidewalk. This motion objectively conveyed that the officers sought to detain Bryant. Indeed, Officer Lantion testified at the evidentiary hearing that his gesture was meant to usher Bryant towards the sidewalk so that he and Officer Rodriguez could conduct an investigatory stop. Nov. 18 Tr., 55:6–8, 58:7–20. By giving objective manifestation to the officers' intent to conduct a Terry stop, Officer Lantion's gesture clarified that Officer Rodriguez's physical contact with Bryant was also intended to restrain him.

Third, the physical force Officer Rodriguez applied to Bryant, while slight, was more prolonged and intrusive than a tap on the shoulder. Unlike a tap for attention, Officer Rodriguez's contact with Bryant's arm continued until Bryant turned to face him. That continued physical force evinced a nonconsensual encounter, not a bid for attention Bryant was free to ignore. Additionally, Officer Rodriguez placed his hand on Bryant's upper arm, a body location less suitable for requesting a stranger's attention than for restraining a person should they decide to flee. So Officer Rodriguez's hand placement also manifested an intent to restrain.

True, these physical signals were subtle. And this Court does not decide whether Officer Rodriguez's contact with Bryant, standing alone, would manifest an intent to restrain. It suffices to say that Officer Rodriguez's contact with Bryant objectively manifested an intent to restrain him when viewed in context with Officer Lantion's simultaneous conduct. Accordingly, the Court finds that Officer Rodriguez seized Bryant by physical force.

### III.    BRYANT'S SEIZURE VIOLATED HIS FOURTH AMENDMENT RIGHTS

Because Bryant has shown that he was subject to a warrantless seizure, the burden shifts to the government to justify that seizure by demonstrating it was reasonable. Jones, 1 F.4th at 52.

To demonstrate that a Terry stop was reasonable, the police officers conducting the stop "'must be able to point to specific and articulable facts which, taken together with rational inferences from those facts' support 'a reasonable and articulable suspicion that the person seized is engaged in criminal activity.'" United States v. Castle, 825 F.3d 625, 634 (D.C. Cir. 2016) (first quoting Terry, 392 U.S. at 21; then quoting Reid v. Georgia, 448 U.S. 438, 440 (1980)). Whether officers have reasonable suspicion "is dependent upon both the content of information possessed by police and its degree of reliability." Alabama v. White, 496 U.S. 325, 330 (1990).

An anonymous tip corroborated only by "a subject's readily observable location and appearance" is generally insufficient to establish reasonable suspicion. Florida v. J.L., 529 U.S. 266, 272 (2000). This is the case because "[u]nlike a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated, an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity." Id. at 270 (citation modified). To quell these concerns about accuracy and truthfulness, and thus supply officers with reasonable suspicion, a tip from an unnamed source must be imbued with "indicia of reliability." See id.

For example, anonymous tips made through traceable means and by persons with contemporaneous, firsthand knowledge may provide reasonable suspicion. See Navarette v. California, 572 U.S. 393, 399–400 (2014); see also United States v. Thompson, 234 F.3d 725, 729 (D.C. Cir. 2000). Such tips are more reliable because the basis for the tip is apparent, and the tipsters lack sufficient time to fabricate or forget. Navarette, 572 U.S. at 400 ("[S]ubstantial contemporaneity of event and statement negate the likelihood of deliberate or conscious misrepresentation" (quoting Fed. R. Evid. 803(1) advisory committee's note)). Transmission through traceable means further mitigates the risk of insincerity, as the threat of prosecution for

9

making a false report "provide[s] some safeguards." Id.; see also Thompson, 234 F.3d at 729 (finding an anonymous tip more reliable when it was made face-to-face and "the police need only have asked for [the tipster's] identification or simply noted the license plate on his car").

In its briefing and at the evidentiary hearing, the government did not contend that the officers had reasonable suspicion that criminal activity was afoot when Officer Rodriguez touched Bryant's arm. See Gov't Br. in Opp'n [ECF No. 25]; Nov. 18 Tr., 116:9–117:22. The government's decision was wise. Just like in J.L., the sole ground for Bryant's seizure was the "bare report" of an unknown bouncer "who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about [the defendant]." 529 U.S. at 271. That is insufficient. See id.

To be sure, the unnamed bouncer made his tip in person, rendering it more reliable than an untraceable phone call. See Thompson, 234 F.3d at 729. But while a face-to-face encounter may abate concerns that the bouncer was insincere, it does nothing to address the second danger the Supreme Court identified in Navarette: officers' inability to judge the veracity of an anonymous tip without knowing the basis for the tip. That concern surfaces forcefully here, where the government has not offered any evidence that the bouncer saw Bryant with a firearm. Indeed, Officer Lantion testified that he could not remember whether the bouncer told him that he personally saw the gun or merely heard about the gun from someone else. Nov. 18 Tr., 51:2–24.

The lack of foundation for the bouncer's tip also calls into question whether the officers had reason to suspect Bryant of criminal conduct, because the bouncer's statement did not clearly allege illegality. See United States v. Brown, 925 F.3d 1150, 1154 (9th Cir. 2019) (holding that an anonymous tip asserting that the defendant had a gun did not supply officers with reasonable suspicion because firearm carry "is presumptively lawful"); United States v. Ubiles, 224 F.3d 213,

217–18 (3d Cir. 2000) (same). In D.C., it is legal to bear a concealed firearm. D.C. Code §§ 22-4504(a), 22-4506. It is, of course, not legal to openly carry a gun or bring one into a night club. D.C. Code § 7-2509.07(a)(7), (e). But to reasonably infer that Bryant violated either of these laws, the bouncer would have to tell the officers how he knew about the firearm. He did not.

In short, the anonymous bouncer's tip—which alleged without foundation or corroboration that a person matching Bryant's general description and location had a firearm—more closely resembles the tip in J.L. than the tips in Thompson or Navarette. See Thompson, 234 F.3d at 729 (emphasizing that "[t]he informant stated that he 'just saw'" the defendant with a firearm, which was illegal in D.C. at the time)[3]; Navarette, 572 U.S. at 399 ("By reporting that she had been run off the road by a specific vehicle—a silver Ford F–150 pickup, license plate 8D94925—the caller necessarily claimed eyewitness knowledge of the alleged dangerous driving."). This Court therefore concludes that Officer Rodriguez seized Bryant without reasonable suspicion that he was engaged in criminal activity, in violation of his Fourth Amendment rights.

IV. **BRYANT'S SEIZURE CAUSED THE DISCOVERY OF THE FIREARM**

To prevail on a motion to suppress, a defendant "must make a prima facie showing of a causal nexus between the Fourth Amendment violation and the evidence he seeks to suppress." Holmes, 505 F.3d at 1292. Put differently, the unlawful search or seizure must be a "but-for cause of the discovery of the evidence" and the causal chain may not be "too attenuated to justify exclusion." Brodie, 742 F.3d at 1062 (citation modified); see also United States v. Gamble, 77 F.4th 1041, 1046 (D.C. Cir. 2023).

---

[3] The facts of this case are particularly far from Thompson. In Thompson, unlike here, the police officers corroborated the anonymous tip when they observed the defendant behaving suspiciously. See 234 F.3d at 729 (describing the defendant as "concealing himself behind [a] fence and peering out toward the street" from "the parking lot of a closed restaurant at three o'clock in the morning").

11

### A. But-For Causation

Although the evidence presented regarding the origins of the recovered firearm is not conclusive, Bryant has carried his burden to put forward a prima facie case of but-for causation.

Bryant's primary support for his claim that the officers would not have discovered the firearm but for his illegal seizure is Officer Lantion's testimony that Officer Rodriguez said he saw Bryant pass the firearm to the unidentified man. Nov. 18 Tr., 61:1–3. Upon a motion to suppress, the parties and the court may rely on hearsay statements like Officer Rodriguez's for substantive purposes. See United States v. Raddatz, 447 U.S. 667, 679 (1980); Fed. R. Evid. 104(a). And the government, understandably, does not challenge Officer Rodriguez's statement. The Court thus finds that Officer Rodriguez's statement, in combination with body camera footage showing the flight of the unidentified man and the recovery of the gun close to his flight path, is sufficient to show but-for causation. See Gamble, 77 F.4th at 1046 (reiterating that but-for causation between an unlawful seizure and the recovery of a firearm was "quite plain" when the seizure prompted the defendant to flee and discard the firearm).

### B. Attenuation

With a violation of Bryant's Fourth Amendment rights and but-for causation established, the burden shifts to the government to show an exception to the exclusionary rule applies. Brodie, 742 F.3d at 1063; see also Strieff, 579 U.S. at 237–38. To do so, the government invokes the attenuation doctrine. It contends that because Bryant passed the gun to the unidentified man after his seizure ended and the unidentified man abandoned it in the street, the gun's discovery is too attenuated from Bryant's unlawful seizure to justify its evidentiary exclusion.

"The attenuation doctrine evaluates the causal link between the government's unlawful act and the discovery of evidence . . . ." Strieff, 579 U.S. at 238. Attenuation precluding the

application of the exclusionary rule can occur "when the causal connection is remote" or when suppression would not serve "the interest protected by the constitutional guarantee . . . violated." Hudson v. Michigan, 547 U.S. 586, 593 (2006); see also Holmes, 505 F.3d at 1293. The Supreme Court has identified three factors that courts must consider when determining whether a causal chain is too attenuated for suppression: (1) the temporal proximity between the initially unlawful stop and the discovery of the evidence, (2) the presence of intervening circumstances, and (3) the purpose and flagrancy of the official conduct. Strieff, 579 U.S. at 239 (citing Brown v. Illinois, 422 U.S. 590, 603–04 (1975)).

In Brodie, the D.C. Circuit applied these attenuation factors in a case closely analogous to Bryant's. There, the defendant broke away from officers during a brief, unlawful seizure, fled, and jettisoned three firearms as he ran. 742 F.3d at 1060. The government argued that the exclusionary rule did not apply to the discarded guns because the defendant's flight and disposal of them were intervening circumstances that attenuated the causal chain. Id. But the D.C. Circuit rejected the government's contention.

The Brodie court explained that the brief nature of the defendant's seizure and his subsequent flight did not preclude application of the exclusionary rule because "[l]ater acts of noncompliance" did not negate the fact that an unlawful seizure initially occurred. Id. at 1061. Rather, the defendant's actions "flowed directly" from his seizure. Id. at 1063. And unlike "new crime[s]" or conduct "posing serious risks to the public safety," the defendant's actions did not attenuate the connection between the unlawful seizure and the discovery of the evidence. Id. The absence of intervening circumstances proved dispositive in Brodie. The D.C. Circuit determined that the first and third attenuation factors canceled out—the violation of Brodie's constitutional rights was not flagrant, but the evidence was discovered seconds after the violation. Id. With no

13

attenuation from intervening circumstances, the court held that the firearms ought to have been suppressed and reversed the defendant's conviction. Id. at 1064.

Before proceeding to analyze attenuation here, this Court notes that the D.C. Circuit's holding in Brodie is somewhat at odds with statements from the Supreme Court. In Torres v. Madrid, the Supreme Court remarked that "the Fourth Amendment does not recognize any 'continuing arrest during the period of fugitivity.'" 592 U.S. at 318 (quoting Hodari D., 499 U.S. at 625). So "[t]he fleeting nature" of some physical seizures "undoubtedly may inform . . . what [subsequently discovered] evidence a criminal defendant may exclude from trial." Id.

Several district courts have elected to follow these statements and hold that once a seizure ends, subsequent disclosure of evidence is not subject to the exclusionary rule. See United States v. Daniels, Crim. A. No. 19-709-1, 2022 WL 1540035, at *8 (N.D. Cal. May 16, 2022) (denying motion to suppress where "neither the gun or other contraband was dislodged" until the physical seizure had concluded); United States v. Wilkins, 451 F. Supp. 3d 222, 230 (D. Mass. 2020) (denying motion to suppress where the defendant abandoned illicit drugs after fleeing a seizure by show of authority because there is no continuing arrest during fugitivity); United States v. Williams, 608 F. Supp. 2d 325, 330 (E.D.N.Y. 2008) (denying motion to suppress where the defendant broke free of the officer's grasp before the officer discovered the gun, "render[ing] the legality of that seizure an irrelevancy").

But that is not the rule in this Circuit. See Brodie, 742 F.3d 1058; Gamble, 77 F.4th at 1046 (reaffirming Brodie's vitality after Madrid v. Torres). And "district judges . . . are obligated to follow controlling circuit precedent until either [the Circuit], sitting en banc, or the Supreme Court, overrule[s] it." United States v. Torres, 115 F.3d 1033, 1036 (D.C. Cir. 1997). Intervening Supreme Court precedent only overrules controlling circuit precedent if it "eviscerates" the

14

precedent, rendering the cases "incompatible." Perry v. MSPB, 829 F.3d 760, 764 (D.C. Cir. 2016).

This Court finds that Torres v. Madrid is neither intervening nor incompatible with circuit law. Two years after Torres, the D.C. Circuit reaffirmed Brodie in Gamble. 77 F.4th at 1046. And while Torres reasons that the end of a brief physical seizure "undoubtedly may inform" analysis under the exclusionary rule, it does not categorically exclude evidence discovered after a brief physical seizure from the rule's ambit. 592 U.S. at 318. The Court's statement in Torres is therefore compatible with Gamble and Brodie and this Court will follow them here.

Applying the attenuation factors to the facts of this case, this Court concludes that the exclusionary rule applies. As in Brodie and Gamble, while the officers' discovery of the firearm occurred mere seconds after Bryant's unlawful seizure, the violation of Bryant's Fourth Amendment rights was not flagrant. Factors 1 and 3 therefore cancel out. See Brodie, 742 F.3d at 1063. And the D.C. Circuit has already held in Brodie that a defendant's decision to break away from a seizure and discard a handgun is not an intervening circumstance barring application of the exclusionary rule.[4] See id.; Gamble, 77 F.4th at 1046. That Bryant passed the firearm to a third person who then fled and discarded it does not meaningfully alter the analysis. The unidentified man's actions were his immediate responses to Bryant's seizure; they were not distant, unconnected acts. In short, Brodie and Gamble control. The Court thus holds that the attenuation exception to the exclusionary rule does not apply here.

---

[4] The government does not attempt to distinguish the D.C. Circuit's decisions in Gamble and Brodie on the basis that they concerned defendants who fled from seizures by show of authority, not seizures by physical force. For good reason, as it would make little sense to hold that the end of a seizure by physical force precludes application of the exclusionary rule but the end of a seizure by show of authority does not.

15

## CONCLUSION

For these reasons, Bryant's motion to suppress is **GRANTED** and it is hereby **ORDERED** that the firearm shall be excluded.

    **SO ORDERED.**

/s/
JOHN D. BATES
United States District Judge

Dated: December 4, 2025